IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-03352-PAB-KLM

MARY KANE, an individual,

      Plaintiff,

v.

HONEYWELL HOMMED, LLC, and
TERRY DUESTERHOEFT,

      Defendants.

---

**ORDER**

---

This matter is before the Court on Defendant Honeywell HomMed, LLC's Motion for Summary Judgment [Docket No. 53] and Defendant Duesterhoeft's Motion for Summary Judgment and Brief in Support [Docket No. 52]. The Court's jurisdiction is based on 28 U.S.C. §§ 1331 and 1337. The facts of this case involve a romantic relationship in the workplace that plaintiff Mary Kane claims led to violations of Title VII and state law.

## I. BACKGROUND

The following facts are undisputed unless otherwise indicated. Defendant Honeywell HomMed, LLC ("HomMed") is a strategic business group within the Life Safety Division of Honeywell International ("Honeywell"). Docket No. 53 at 3, ¶ 1; Docket No. 59 at 2. Ms. Kane was hired by HomMed in February 2006 as a Clinical Consultant. Docket No. 53 at 3, ¶ 2; Docket No. 59 at 2. Her job duties required frequent travel. Docket No. 53 at 3, ¶ 4; Docket No. 59 at 2.

In January 2007, Ms. Kane was promoted to Clinical Marketing Manager, reporting to HomMed's then-Vice President of Marketing, defendant Terry Duesterhoeft, who reported to HomMed's President.  Docket No. 53 at 3-4, ¶¶ 5-7; Docket No. 59 at 2.  Shortly after her promotion, Ms. Kane filed for divorce from her husband, with whom she has two children.  Docket No. 53 at 4, ¶ 10; Docket No. 59 at 2.  Ms. Kane spoke with Mr. Duesterhoeft and HomMed's President to request that her business travel be limited during her divorce and they agreed to eliminate her non-essential business travel.  Docket No. 53 at 4, ¶¶ 11-12; Docket No. 59 at 2.

Over time, Ms. Kane began to discuss personal matters with Mr. Duesterhoeft. Docket No. 53 at 4, ¶ 13; Docket No. 59 at 2.  Mr. Duesterhoeft informed Ms. Kane that he was living with his girlfriend and her son.  Docket No. 53 at 4, ¶ 14; Docket No. 59 at 2, ¶ 14.  In January 2008, Mr. Duesterhoeft informed Ms. Kane that he and his girlfriend were engaged.  Docket No. 53 at 4, ¶ 15; Docket No. 59 at 2.

On March 13, 2008, Mr. Duesterhoeft met Ms. Kane while she was on a business trip in Amsterdam.  Docket No. 53 at 4, ¶ 16; Docket No. 59 at 2, ¶ 16. Following dinner, Ms. Kane and Mr. Duesterhoeft had sex.  Docket No. 53 at 5, ¶ 17; Docket No. 59 at 2.  Ms. Kane testified at her deposition that Mr. Duesterhoeft initiated this encounter by sending her a text message that said "I can't be your boss anymore," after which she called him and he invited her to his hotel room, where he expressed romantic feelings for her and made physical advances.  Docket No. 60-3 at 8 (Kane dep., at 53, l.1 to 56, l.21).  They had sex on at least three occasions during her stay in

Amsterdam.[1]  Docket No. 53 at 5, ¶ 18; Docket No. 59 at 2, ¶ 18.

Ms. Kane alleges that, following the trip to Amsterdam, Mr. Duesterhoeft told her that he had called off his engagement.  Docket No. 53 at 5, ¶ 19; Docket No. 59 at 2.  In May 2008, Mr. Duesterhoeft married his girlfriend.  Docket No. 60-12.  In spring 2008, Ms. Kane and Mr. Duesterhoeft began a romantic relationship, which continued until the end of July 2010.  Docket No. 53 at 5, ¶¶ 20-21; Docket No. 59 at 2.  Over the course of their relationship, they introduced one another to their respective children and friends, exchanged gifts, and traveled together.  Docket No. 53 at 5, ¶¶ 22-25; Docket No. 59 at 2.  By mid-summer 2008, Ms. Kane was in love with Mr. Duesterhoeft and believed that he loved her.  Docket No. 53 at 6, ¶ 27; Docket No. 59 at 2; Docket No. 53-2 at 54 (Kane dep., at 237, ll.11-16).

During the eighteen months when Ms. Kane was both employed by HomMed and in a relationship with Mr. Duesterhoeft, she received a total salary increase of $64,000–four times her increase in pay during her first two years with the company.  Docket No. 60 at 8, ¶ 13-14; Docket No. 60-3 at 5 (Kane dep., at 31, l.1 to 32, l.10).  She also received positive evaluations and several promotions.  *Id*. at 12 (Kane dep., at 73, ll.13-19); Docket No. 53 at 8, ¶ 47; Docket No. 59 at 2.

HomMed's sexual harassment policy provides that, if an employee "believes that he or she is being harassed . . ., the employee should report the violation immediately

---

[1] Ms. Kane testified that, on the trip to Amsterdam, she told Mr. Duesterhoeft that she was uncomfortable engaging in sexual relations with him.  Docket No. 60-3 at 36 (Kane dep., at 230, ll.1-16).  Ms. Kane further testified that, on a subsequent business trip to Chicago, Mr. Duesterhoeft put "tremendous pressure" on her to engage in sexual relations, but she declined.  Docket No. 60-3 at 36 (Kane dep., at 232 ll.18-24).

to a Company supervisor; or if the employee prefer for any reason, to the Human

Resources Department or to the Company's confidential U.S. ACCESS line."  Docket

No. 53-3 at 40, § 5.4.1.  It also provides that

> Any supervisory employee involved in a consensual, romantic and/or sexual relationship with an employee over whom the supervisor has supervisory authority will report the relationship to his or her supervisor and to the local human resources generalist.   The supervisor and human resources generalist will determine the appropriate action that will be taken. Appropriate action may include a change in the responsibilities of the individuals involved, a transfer, or a termination.

Docket No. 53-3 at 40, § 5.3.1.

Ms. Kane contends that she was uncomfortable reporting to someone with whom

she was romantically involved; she wanted to inform human resources of the

relationship to find a way to resolve the situation.  Docket No. 53 at 6, ¶¶ 28, 29; Docket

No. 59 at 2.  She further contends that Mr. Duesterhoeft discouraged her from reporting

the relationship by stating that it would put both their jobs at risk given HomMed's policy

on relationships between supervisors and subordinates.  Docket No. 53 at 6, ¶ 30;

Docket No. 59 at 2; Docket No. 60-3 at 13 (Kane dep., at 79, ll.12-20).  In fall 2008, Ms.

Kane agreed to let Mr. Duesterhoeft try to find a solution to their situation other than

reporting their relationship to human resources.  Docket No. 53 at 6, ¶¶ 33, 35; Docket

No. 59 at 2-3, ¶¶ 33, 35.  She simultaneously searched for employment outside of

HomMed.  Docket No. 53 at 7, ¶ 38; Docket No. 59 at 3, ¶ 35.  In September 2008,

McKesson Corporation offered her a job, but she turned it down because it was only a

temporary position.  Docket No. 53 at 7, ¶¶ 39-40; Docket No. 59 at 2, 3, ¶ 40.

In October 2008, Honeywell offered Ms. Kane a retention bonus if she remained

through Honeywell's efforts to sell HomMed.  Docket No. 53 at 7, ¶ 41; Docket No. 59

4

at 2.  Ms. Kane accepted the offer, agreeing to work until October 2009 in exchange for a bonus of $70,000.  Docket No. 53 at 7, ¶ 42; Docket No. 59 at 2.  In March 2009, Mr. Duesterhoeft was promoted to President of HomMed, reporting to the President of Honeywell's Fire Systems Division.  Docket No. 53 at 7, ¶¶ 43-44; Docket No. 59 at 2.

On November 2, 2009, Ms. Kane submitted her resignation letter to HomMed, effective November 20, 2009.  Docket No. 53 at 8, ¶ 48; Docket No. 59 at 2.  Several Honeywell executives attempted to dissuade Ms. Kane from resigning.  Docket No. 53 at 8, ¶¶ 51-52; Docket No. 59 at 2.  Ms. Kane did not report harassing conduct by Mr. Duesterhoeft to anyone at HomMed during or after her resignation.  Docket No. 53 at 8, ¶ 53; Docket No. 59 at 2.

Ms. Kane and Mr. Duesterhoeft continued their romantic relationship for nine months after Mr. Kane resigned from HomMed.  Docket No. 53 at 9, ¶ 59; Docket No. 59 at 2.  In April 2010, Ms. Kane and Mr. Duesterhoeft became engaged; they set a wedding date of August 14, 2010.  Docket No. 53 at 9, ¶ 63; Docket No. 59 at 2.  Mr. Duesterhoeft encouraged Ms. Kane not to return to work and agreed to support her financially, at least until the wedding.  Docket No. 53 at 9, ¶¶ 60-61; Docket No. 59 at 2.  Between April 2010 and July 2010, Mr. Duesterhoeft deposited approximately $60,000 in a bank account he held jointly with Ms. Kane towards Ms. Kane's living expenses.  Docket No. 53 at 9, ¶ 62; Docket No. 59 at 4, ¶ 62.

In late July 2010, Ms. Kane learned that Mr. Duesterhoeft was already married and broke off her engagement with him.  Docket No. 53 at 9, ¶¶ 64-65; Docket No. 59 at 2.  Ms. Kane then sought Mr. Duesterhoeft's assistance in returning to HomMed.  Docket No. 53 at 10, ¶ 68; Docket No. 59 at 2.  In August 2010, they exchanged a

number of emails regarding Mr. Duesterhoeft's attempt to create a position for Ms. Kane at HomMed.  Docket No. 53 at 10, ¶ 69; Docket No. 59 at 2.

On September 10, 2010, Ms. Kane filed a charge of discrimination against HomMed with the Equal Employment Opportunity Commission ("EEOC") alleging that she was subject to a hostile work environment while employed there.  Docket No. 60-1 at 1.  HomMed did not receive formal notice of Ms. Kane's EEOC charge until September 28, 2010.  Docket No. 53 at 12, ¶ 85; Docket No. 59 at 2.  On September 20, 2010, the human resources manager at HomMed offered Ms. Kane the position of Strategic Clinical Accounts Director, which would have reported to Mr. Duesterhoeft.  Docket No. 53 at 10, ¶¶ 71-72; Docket No. 59 at 2.  Ms. Kane stated that she did not want to accept a position reporting to Mr. Duesterhoeft and that she had filed a charge of discrimination with the EEOC, but did not provide any further details about her claim.  Docket No. 53 at 10-11, ¶¶ 73-75; Docket No. 59 at 2.  This was the first informal notice HomMed received of Ms. Kane's EEOC charge.  Docket No. 53 at 11, ¶ 76; Docket No. 59 at 2.  On September 23, 2010, the human resources manager contacted Ms. Kane and asked her why she would not accept the position, but Ms. Kane declined to provide additional information.  Docket No. 53 at 11, ¶ 77; Docket No. 59 at 2.  HomMed proceeded to withdraw the job offer.  Docket No. 53 at 11, ¶ 78; Docket No. 59 at 2.  Prior to withdrawing the job offer, the human resources manager was not aware of Ms. Kane's relationship with Mr. Duesterhoeft.  Docket No. 53 at 12, ¶ 83; Docket No. 59 at 2.  HomMed did not consider or hire anyone for the position it had offered Ms. Kane.  Docket No. 59 at 12, ¶ 82; Docket No. 59 at 2.

On August 31, 2011, Ms. Kane filed this case against HomMed and Mr.

Duesterhoeft in the District Court for Boulder County, Colorado; on December 22, 2011,

defendants removed the case to this Court.  Docket Nos. 1, 2.  Ms. Kane asserts that

HomMed violated Title VII of the 1964 Civil Rights Act ("Title VII") by subjecting her to a

hostile work environment and by failing to rehire her in retaliation for filing a charge of

discrimination with the EEOC.  Docket No. 70 at 6.  She also asserts a state law claim

against HomMed for intentional infliction of emotional distress.  *Id.*  She asserts state

law claims against Mr. Duesterhoeft for intentional infliction of emotional distress and

intrusion on seclusion.  Docket No. 70 at 8.  Ms. Kane seeks to recover compensatory,

liquidated, and punitive damages, including back pay and front pay, future pecuniary

loss, attorney's fees, costs, and interest.  Docket No. 2 at 15.  Defendants have moved

for summary judgment on all claims.  Docket Nos. 52 and 53.

## II.  STANDARD OF REVIEW

According to Federal Rule of Civil Procedure 56, a court "shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see*

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986).  In pursuing summary

judgment, the moving party generally bears the initial burden of showing the absence of

a genuine dispute concerning a material fact in the case.  *Celotex Corp. v. Catrett,* 477

U.S. 317, 323 (1986).  However, "[w]hen, as in this case, the moving party does not

bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary

judgment stage by identifying a lack of evidence for the nonmovant on an essential

element of the nonmovant's claim."  *Bausman v. Interstate Brands Corp.,* 252 F.3d

1111, 1115 (10th Cir. 2001).

"Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colorado, Inc. v. City & Cnty. of Denver,* 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex,* 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324; *see* FED. R. CIV. P. 56(e). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman,* 252 F.3d at 1115. However, to be clear, "it is not the party opposing summary judgment that has the burden of justifying its claim; the movant must establish the lack of merit." *Alpine Bank v. Hubbell,* 555 F.3d 1097, 1110 (10th Cir. 2009).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson,* 477 U.S. at 248).

## III. DISCUSSION

### A. Hostile Work Environment

"[A] plaintiff may establish a violation of Title VII by proving that discrimination

8

based on sex has created a hostile or abusive work environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).  Actionable harassment "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Id*. at 65.  To survive summary judgment on a hostile work environment claim, "a plaintiff must show that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment" and (2) the harassment stemmed from animus.  *Chavez v. New Mexico*, 397 F.3d 826, 831-32 (10th Cir. 2005) (quoting *Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir.1994) (citation omitted)).  In determining whether conduct is sufficiently severe or pervasive, courts consider: "(1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." *Holmes v. Regents of Univ. of Colo.*, 176 F.3d 488, 1999 WL 285826, at *7 (10th Cir. May 7, 1999) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  "Based on the totality of the circumstances, the environment must be perceived both subjectively and objectively as abusive." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998).

It is well-accepted that a "person's private and consensual sexual activities do not constitute a waiver of his or her legal protections against unwelcome and unsolicited sexual harassment." *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1001 (10th Cir. 1996).  Accordingly, a plaintiff's voluntary engagement in sexual conduct is not a

defense to a hostile work environment claim, which turns on whether the alleged advances were "unwelcome." *Meritor*, 477 U.S. at 68. "[T]he question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Id*.

In *Williams v. Herron*, 687 F.3d 971, 975 (8th Cir. 2012), the court held that a sexual harassment claim survived summary judgment where the plaintiff presented evidence that, one month after she told her boss that she did not wish to remain in a relationship with him, he began to harass her by grabbing and hugging her while she was clocking out, making "pouty faces at her all day," and initiating a sexual encounter with her in his office. In addition, the plaintiff was concerned that her job would be at risk if she stopped engaging in sexual relations with her boss because he had previously pursued three other employees, all of whom were terminated after ending their relationships with him. *Id*. at 976. The former employees testified that he had "established a pervasive system of sexual coercion . . ., enticing women to enter it with workplace benefits and securing their continued participation with the threat of negative employment consequences." *Id*. The plaintiff in *Williams* testified that her boss' conduct "made her very distressed, resulting in depression, anxiety, missed work, crying while on the job, and an undesired shift change." *Id*.

In contrast, evidence that the romantic relationship persisted after the plaintiff left the allegedly hostile work environment tends to undermine the plaintiff's claim. The court in *Mosher v. Dollar Tree Stores, Inc.*, 240 F.3d 662 (7th Cir. 2001), affirmed a grant of summary judgment in favor of the defendant on a hostile work environment

claim where the plaintiff alleged that, on her third day of work, her supervisor pulled her

onto his lap and fondled her, after which the two entered into a consensual relationship

that continued five months following the plaintiff's resignation.  Over the course of their

relationship, the plaintiff accepted gifts from her supervisor, permitted him to pay her

rent for a period of nine months, met his parents, and referred to him as her boyfriend.

*Id*. at 667.  She did not mention or complain about being fondled to any of her other

supervisors or co-workers and did not resign until four months after the incident took

place.  *Id*. at 668 ("While this readily could be considered a severe incident, [the

plaintiff's] reaction suggests that she did not perceive it as such.  At the time, she

reported the incident to no one and within weeks was involved in what can only be

reasonably described as a consensual sexual relationship with [her supervisor] which

continued for many months.").  The court found that "no reasonable jury could conclude

that [the plaintiff] was anything other than a willing participant in a long, consensual

relationship with her boss."  *Id*. at 668 ("after a longtime sexual relationship like this one

goes sour, it will be only the unusual case that can escape summary judgment.").

HomMed argues that Ms. Kane cannot show that any of the allegedly harassing

conduct was unwelcome or that it was sufficiently severe or pervasive to qualify as

abusive.  Docket No. 59 at 13-15.  Ms. Kane contends that she was subject to

unwelcome harassment insofar as Mr. Duesterhoeft (1) demanded sexual interaction

with her; (2) required her to travel on business trips so frequently that it interfered with

her other job responsibilities; (3) made threatening remarks about her job security; and

(4) interfered with her job performance when she expressed a need to change their

situation.  Docket No. 59 at 11.  She further argues that Mr. Duesterhoeft forced her to

resign from HomMed.  Docket No. 59 at 17.

First, Ms. Kane asserts that she "was not an equal participant in the sexual relationship between her and Mr. Duesterhoeft" because he "approached Ms. Kane at work with the assumption that they would be engaging in sexual intercourse later that day and made statements to Ms. Kane indicating that she did not have a choice in the matter."  Docket No. 59 at 9.  The only evidence she offers in support of this assertion is her testimony that Mr. Duesterhoeft would say "something like to the effect of, when are you done today?  When can we hook up later tonight?"  Docket No. 59-3 at 11 (Kane dep., at 71, l.3 to 72, l.11).  Ms. Kane testified that they did not engage in any sexual conduct while at work.  *Id.* at 70, l.21-71, l.3.  This evidence is not sufficient to raise a genuine dispute of fact regarding the unwelcomeness and the severity or pervasiveness of the alleged harassment.  Ms. Kane does not state that she regarded the alleged comments as insulting, humiliating, or threatening.  She provides no evidence regarding how frequently they were made or how she reacted to them at the time, for example, that the comments left her feeling distressed, sad, or anxious.  *See Williams*, 687 F.3d at 975.  Thus, there is no basis for concluding that she subjectively perceived such comments as abusive or that they unreasonably interfered with her job performance.

Next, Ms. Kane argues that Mr. Duesterhoeft "increased the amount and frequency of Ms. Kane's business travel so that he could meet her to engage in sexual acts with her."  Docket No. 59 at 14.  Other than the trip to Chicago, Ms. Kane does not allege that she did not want to have sex with Mr. Duesterhoeft on business trips or that she was made uncomfortable by his advances, but rather that traveling left her with less

time to fulfill her other job responsibilities, that Mr. Duesterhoeft was not needed on these trips, and that his decision to accompany her took his attention away from the office where he was needed.  Docket No. 59-3 at 39-40 (Kane dep., at 272, I.22 to 273, I.7) ("I felt that there was a number of trips that I absolutely had the skill set and the confidence and the abilities to foster myself, and that I was confused and perplexed because we–I felt we didn't have enough resources as it was . . . . I felt that we needed to divide and conquer in order to get all the work done").  Nor does Ms. Kane allege that the assigned travel was outside of her job responsibilities.  *See* Docket No. 59-3 at 38 (Kane dep., at 248, ll.3-25).

Ms. Kane's  testimony supports an inference that traveling less would have made it easier for her to balance her workload, that Mr. Duesterhoeft scheduled business trips for her more frequently than she wanted, that he traveled with her frequently so that he could have sex with her, and that his decision to travel with her might not have always been prudent from a business perspective.  *See* Docket No. 59-3 at 15 (Kane dep., at 86, I.19 to 88, I.6).  It does not, however, reasonably support an inference that the travel was inconsistent with–and therefore altered the terms of–her employment.  *See* *Chavez*, 397 F.3d at 831-32.  Furthermore, her testimony that her work performance continued to be "excellent" precludes a finding that the business trips meaningfully detracted from her ability to perform her job.  *See* Docket No. 59-3 at 15 (Kane dep., at 86, ll.19-22); *see also Meritor*, 477 U.S. at 66.

Third, Ms. Kane argues that Mr. Duesterhoeft harassed her by threatening her job.  Docket No. 59 at 13.  However, she does not cite any statements or actions on his

part that contributed to this fear. *See* Docket No. 59-3 at 17 (Kane dep., at 95, ll.13-16) ("Did Mr. Duesterhoeft ever say to you that if you reported the relationship, he would fire you?  A.  No."). Rather, she offers evidence that he cautioned her that both their jobs could be in danger if she were to report their relationship to human resources. *See* Docket No. 59-3 at 13 (Kane dep., at 79, ll.19-20) ("He said that we could both stand to lose our jobs."). In addition, she offers her testimony that she was not "comfortable" that Mr. Duesterhoeft "really could or that he wanted or had any desire to protect" her job. Docket No. 59-3 at 13 (Kane dep., at 79, ll.2-5). Ms. Kane's testimony supports an inference that she was worried about her job because of HomMed's policy on relationships between supervisors and subordinates and not because of anything that Mr. Duesterhoeft said or did. *See also* Docket No. 59-3 at 16 (Kane dep., at 92, ll.4-7) ("Q.  Okay.  But you're telling us here that the reason you kept the relationship ongoing during the time you worked at Honeywell was because you thought you would lose your job if you broke off the relationship? . . . A.  I could lose my job.  And, in fact, I believe that if [the relationship] had been reported, that that was—that was an outcome that could happen as part of the policy.").

Moreover, Ms. Kane's testimony that she remained with Mr. Duesterhoeft mainly out of fear she would lose her job if she left him, *see* Docket No. 60-3 at 37 (Kane dep., at 235, ll.4-18), is undermined by her testimony that she remained with him because she was in love with him. Docket No. 53-2 at 54 (Kane dep., at 237, ll. 1-10) ("I obviously fell in love with him during that time.  But that is not—it was a very confusing—what he said and how he said he was going to take care of the reporting structure and my job and the protections that he would give me were in conflict in my

14

mind with, also, the fact that I had fallen in love with him.").

Fourth, Ms. Kane asserts that Mr. Duesterhoeft interfered with her job performance when she threatened to end their relationship unless the reporting structure were altered.  Docket No. 59 at 11.  In support of this assertion, Ms. Kane offers her testimony that Mr. Duesterhoeft's reaction to this threat "ranged from the cold shoulder to doing things at work that I felt undermined my ability."  Docket No. 59-3 at 39 (Kane dep., at 271, ll.13-14).  She cites only one specific instance of such conduct, namely, that he would "allow others to set up" meetings to which she was not invited. *Id*. at 41 (Kane dep., at 277, ll.9-15).  In other words, Ms. Kane's assertion that Mr. Duesterhoeft sought to undermine her is based on occasions when he allegedly remained passive instead of making an active effort to assist or support her.  Even taking these allegations as true, they are insufficient to establish that Mr. Duesterhoeft behaved with "the purpose or effect of unreasonably interfering" with Ms. Kane work performance or "creating an intimidating, hostile, or offensive working environment." *Meritor*, 477 U.S. at 65.

Furthermore, Ms. Kane's claim that Mr. Duesterhoeft harassed her is undermined by her testimony that, while at HomMed, she did not want human resources to discipline Mr. Duesterhoeft, but rather wished to find a way for HomMed to better accommodate their relationship.  *See* Docket No. 59-3 at 14 (Kane dep., at 81, ll.2-5) ("Q.  You didn't want Honeywell to discipline Mr. Duesterhoeft, did you?  A.  I don't know that I ever had that in my thoughts."); *id*. at 18 (Kane dep., at 99, ll.22-23) ("to say that I wish that I didn't or that I wasn't in the relationship is inaccurate").  In addition, Ms. Kane testified that she did not perceive Mr. Duesterhoeft's conduct as

15

harassment until after she found out that he was already married, a discovery that took place nine months after her departure from HomMed.  Docket No. 60-3 at 27 (Kane dep., at 137, l.20 to 138, l.9) ("I believe the nature of our relationship after I left the company, based on the lies he told me, was different.  In other words, I didn't have any indication that he was married. . . . It became clear to me that there was discrimination after the truth had come out about what Terry had done.").  Notably, Ms. Kane did not testify that, during her employment, she wanted to report unwelcome conduct on the part of Mr. Duesterhoeft, but was dissuaded from doing so.  Rather, she invokes only the provision of the sexual harassment policy pertaining to consensual relationships between supervisors and their reports.  *Compare* Docket No. 59-6 at 1-2, § 5.1 ("How to recognize sexual harassment") *with* Docket No. 59-6 at 2, § 5.3 ("Consensual Relationships").  Her claim is likewise undercut by the fact that she voluntarily contacted Mr. Duesterhoeft in seeking to return to HomMed in fall 2010, after she had broken off the engagement.  Docket No. 53 at 10, ¶ 68; Docket No. 59 at 2.

    In addition to her assertions regarding unwelcome conduct, Ms. Kane argues in her response brief that Mr. Duesterhoeft forced her to resign from HomMed.  Docket No. 59 at 17.  This argument is directly undermined by Ms. Kane's testimony that she left HomMed "because we couldn't–I couldn't find a solution for the romantic relationship I was having with Terry and the reporting structure and neither could he, he said, and the relationship was inappropriate.  And so I wanted to–I couldn't–it was too much pressure for me to continue."  Docket No. 53-2 at 25 (Kane dep., at 113, ll.9-17); *see also* Docket No. 60-3 at 17 (Kane dep., at 93, ll.13-23) ("[After resigning from HomMed,] I was relieved of the pressure that I felt for the inappropriate relationship,

16

first and foremost, and so that was my reason for leaving the company").

Ms. Kane argues that this case is like *Williams* because Mr. Duesterhoeft subjected her to harassing conduct, interfered with her ability to do her job, and persisted in the relationship, even though she told him that she was not comfortable being with him unless the reporting structure changed.  Docket No. 59 at 11.  In *Williams*, however, the plaintiff testified that she wanted to end the relationship with her supervisor–and attempted to do so–but that she continued to engage in physical relations with him against her will for fear of losing her job.  *See* 687 F.3d at 973. Here, Ms. Kane has not testified that she wanted to end the relationship but was afraid to do so or that she engaged in any physical activity with Mr. Duesterhoeft against her will.  Rather, she testified that, once she learned of his marriage, it "became clear" to her that she had been discriminated against while at HomMed.  Docket No. 60-3 at 27 (Kane dep., at 137, l.20 to 138, l.9).  In addition, the supervisor in *Williams* had a history of terminating employees who would not remain in relationships with him.  *See* 687 F.3d at 973-74.  There is no evidence that Mr. Duesterhoeft engaged in similar predatory activity.[2]  This case is instead akin to *Mosher*.  *See* 240 F.3d 662.  Ms. Kane did not report or complain of the allegedly unwelcome conduct to anyone except Mr. Duesterhoeft, has not suggested that she wanted to report him to human resources

---

[2] Ms. Kane's testimony that Mr. Duesterhoeft told her that he was involved with an employee at his previous company, who ultimately left the company because of the relationship, *see* Docket No. 59-3 at 35 (Kane dep., at 217, l.19 to 218, l.12), is not comparable to the pattern of harassment in evidence in *Williams*.  *See* 687 F.3d at 976 (the defendant "established a pervasive system of sexual coercion . . ., enticing women to enter it with workplace benefits and securing their continued participation with the threat of negative employment consequences.").

based on unwelcome conduct (as opposed to a consensual relationship), remained in a relationship with him for nine months after leaving HomMed, accepted gifts and financial support from him, and only asserted a harassment claim once she learned of his marriage.  *See id*. at 667-68.

Although sexual harassment may well occur within the context of an otherwise consensual workplace relationship, *see Meritor*, 477 U.S. at 68, the evidence in this case is insufficient to permit a factfinder to reasonably infer that Ms. Kane perceived Mr. Duesterhoeft's conduct as unwelcome during the course of her employment at HomMed.

### B.  Retaliatory Failure to Rehire

Under Title VII, it is unlawful for an employer to discriminate against an employee because she has opposed "any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a).  To succeed on a claim for retaliation, a plaintiff must prove that "her protected activity was a but-for cause of the alleged adverse action by the employer."  *University of Texas Southwestern Med. Ctr. v. Nassar*, --- U.S. ----, 133 S. Ct. 2517, 2534 (2013).  A plaintiff may carry her burden by making either a direct showing that "retaliatory animus played a 'motivating part' in the employment decision" or an indirect showing consistent with the *McDonnell Douglas* burden-shifting framework.  *Id*. at 1225-26 (internal citations omitted).  If the plaintiff relies on direct evidence, then "[o]nce the plaintiff proves that retaliatory animus was a motivating factor, the burden of persuasion shifts to the defendant to prove that it would have taken the same action absent the retaliatory motive."  *Id*.  If the plaintiff relies on indirect

evidence, she must first establish a prima facie case by showing that (1) she engaged in protected opposition to discrimination; (2) she suffered an employment action that a reasonable employee would find materially adverse; and (3) a causal connection existed between the protected activity and the adverse action. *Id.* If the plaintiff can establish a prima facie case, the burden shifts to defendants to provide a legitimate reason for their decision and, if they succeed, shifts back to plaintiff to show that the proffered reason is pretextual. *Id.*

"A causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001). Absent additional evidence of causation, very close temporal proximity is required. *Id.* For example, a one and one-half month gap may be sufficient on its own to establish causation, while a delay of three months will not. *Id.* (citing *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997), and *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

Here, Ms. Kane asserts two theories of retaliation. The first, based on indirect evidence, is that the position offered her was initially designed to report to someone other than Mr. Duesterhoeft and that HomMed restructured the position to report to Mr. Duesterhoeft in retaliation for Ms. Kane's having filed a charge of discrimination. Docket No. 59 at 20. This theory fails as Ms. Kane provides no evidence that HomMed was aware she had filed a charge of discrimination until the September 20, 2010 telephone call in which Ms. Kane was informed that the position would report to Mr.

Duesterhoeft. *Id.*; Docket No. 53 at 11, ¶ 76; docket No. 59 at 2.  As Ms. Kane cannot

show that HomMed had knowledge of her protected activity prior to its taking adverse

action against her, she cannot meet the causation requirement.  *See O'Neal*, 237 F.3d

at 1253.

Ms. Kane's second theory is that she "was assigned to be supervised by the man

who had harassed her during her previous tenure at HomMed," which constitutes

"constructive rejection of Ms. Kane's application."  Docket No. 59 at 20.  To the extent

that this constitutes a retaliation claim, it fails for the same reason discussed above,

namely, that there is no evidence HomMed knew of the charge prior to its decision

regarding the reporting structure for the new position.

In sum, Ms. Kane has not produced sufficient evidence to raise a genuine

dispute of fact that HomMed retaliated against her for filing a charge of discrimination

by offering her a position reporting to Mr. Duesterhoeft or by rescinding its offer to rehire

her.

### C.  State Law Claims

Ms. Kane asserts a state law claim for intentional infliction of emotional distress

against both defendants and a claim for intrusion on seclusion against Mr.

Duesterhoeft.  Docket No. 70 at 2.  Having determined that HomMed is entitled to

summary judgment on Ms. Kane's federal claims, the Court declines to exercise

supplemental jurisdiction over her state law claims.  *See* 28 U.S.C. § 1367(c)(3); *Brooks*

*v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010) ("pendent jurisdiction over state

claims is exercised on a discretionary basis and . . . if federal claims are dismissed

before trial, leaving only issues of state law, the federal court should decline the

exercise of jurisdiction by dismissing the case without prejudice.") (internal citations and

alterations omitted); *Thompson v. City of Shawnee*, 464 F. App'x 720, 726 (10th Cir.

2012) (upon resolving federal claims, the "district court had discretion either to remand"

supplemental state law claims "or to dismiss them").

### IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant Honeywell HomMed, LLC's Motion for Summary

Judgment [Docket No. 53] is GRANTED in part.  Plaintiff Mary Kane's claims against

HomMed for a hostile work environment and retaliatory termination in violation of Title

VII are dismissed.  The Court declines to exercise supplemental jurisdiction over

plaintiff's claim against HomMed for intentional infliction of emotional distress and will

therefore not rule on this aspect of the motion.  It is further

**ORDERED** that the Court declines to exercise supplemental jurisdiction over

plaintiff's claims against Mr. Duesterhoeft for intentional infliction of emotional distress

and intrusion on seclusion and will therefore not rule on Defendant Duesterhoeft's

Motion for Summary Judgment and Brief in Support [Docket No. 52].  It is further

**ORDERED** that this case is remanded to the District Court for the County of

Boulder, Colorado, where this case was filed as No. 2011cv941.

DATED July 30, 2013.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge